IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KENDALL KIANA STEPHENS | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ANDREW SAUL, Commissioner of | : | NO.  18-3954 |
| Social Security[1] | : | |

## MEMORANDUM AND ORDER

ELIZABETH T. HEY, U.S.M.J.                                          July 25, 2019

     Kendall Kiana Stephens ("Plaintiff") seeks review, pursuant to 42 U.S.C. § 405(g),

of the Commissioner's decision denying her claim for supplemental security income

("SSI").[2]  For the reasons that follow, I conclude that the decision of the Administrative

Law Judge ("ALJ") denying benefits is not supported by substantial evidence and will

remand the case for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

---

[1]Andrew Saul became the Commissioner of Social Security ("Commissioner") on June 17, 2019.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Mr. Saul should be substituted for the former Acting Commissioner, Nancy Berryhill, as the defendant in this action.  No further action need be taken to continue this suit pursuant to section 205(g) of the Social Security Act.  42 U.S.C. § 405(g).

[2]Although Plaintiff filed applications for both SSI and disability insurance benefits ("DIB"), Plaintiff requests to proceed only with the appeal of the denial of SSI benefits because she has been unable to locate records supporting her claim prior to the expiration of her insured status.  Doc. 12 at 1 n.1; see also 20 C.F.R. § 404.131 (for DIB eligibility, a claimant must establish disability on or before her date last insured).  Therefore, I will address only Plaintiff's claim for SSI, for which the effective alleged onset date is the application date.  See 20 C.F.R. § 416.335 ("If you file an application [for SSI] after the month you first meet all the other requirements for eligibility, we cannot pay you for the month in which your application is filed or any months before that month.").

# I.     PROCEDURAL HISTORY

Plaintiff filed for SSI on October 6, 2014, claiming that she became disabled on October 29, 2011, due to a combination of physical and mental disorders. Tr. at 98, 160-66, 187.[3] Id. at 187. The application was denied initially, id. 103-06, and Plaintiff requested an administrative hearing before an ALJ, id. at 156, which took place on June 21, 2017. Id. at 33-57. On August 14, 2017, the ALJ found that Plaintiff was not disabled. Id. at 12-28. The Appeals Council denied Plaintiff's request for review on July 10, 2018, id. at 1-3, making the ALJ's August 14, 2017 decision the final decision of the Commissioner. 20 C.F.R. § 416.1472.

Plaintiff commenced this action in federal court on September 12, 2018. Doc. 1. The matter is now fully briefed and ripe for review. Docs. 12 & 13.[4]

# II.    LEGAL STANDARD

To prove disability, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for  . . not less than twelve

---

[3]Plaintiff filed earlier applications for DIB and SSI in January 2010. Tr. at 184. The earlier claims were denied by an ALJ on October 28, 2011, and Plaintiff did not seek further review. Id. at 61-71, 184. The ALJ's October 28, 2011 decision is contained in the record. Id. at 61-71. The earlier decision and the earlier medical records identify Plaintiff as Jonathan Stephens, her former name. See, e.g., id. at 237. Plaintiff began to transition from male to female in her early 20's and changed her name in approximately 2011. Id. at 336, 530.

[4]The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c). See Standing Order, In RE: Direct Assignment of Social Security Appeal Cases to Magistrate Judges (Pilot Program) (E.D. Pa. Sept. 4, 2018); Doc. 8.

months." 42 U.S.C. § 423(d)(1). The Commissioner employs a five-step process, evaluating:

> 1.     Whether the claimant is currently engaged in substantially gainful activity;
>
> 2.     If not, whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities;
>
> 3.     If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the "listing of impairments," 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;
>
> 4.     If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform her past work; and
>
> 5.     If the claimant cannot perform her past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014); see also 20 C.F.R. § 416.920(a)(4). Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at the fifth step to establish that the claimant is capable of performing other jobs in the local and national economies, in light of her age, education, work experience, and RFC. See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007).

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999). Therefore, the issue in this case is

whether there is substantial evidence to support the Commissioner's conclusions that Plaintiff is not disabled and is capable of performing jobs that exist in significant numbers in the national economy. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla." <u>Zirnsak</u>, 777 F.2d at 610 (quoting <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 552 (3d Cir. 2005)). The court has plenary review of legal issues. <u>Schaudeck</u>, 181 F.3d at 431.

## III.   <u>DISCUSSION</u>

### A.   <u>ALJ's Findings and Plaintiff's Claims</u>

The ALJ found that Plaintiff suffered from several severe impairments at the second step of the sequential evaluation; Post-Traumatic Stress Disorder ("PTSD"), right hip injury status post open reduction with internal fixation ("ORIF"), migraines, depression, and anxiety. <u>Tr.</u> at 15. The ALJ found that Plaintiff did not have an impairment or combination of impairments that met the Listings, <u>id.</u> at 15,[5] and that Plaintiff retained the RFC to perform light work except she is limited to lifting and/or carrying up to twenty pounds occasionally; sitting for six hours, standing for four hours, and walking for four hours in an eight-hour workday; occasionally performing postural activities; no pushing and/or pulling with the bilateral lower extremities; she must avoid exposure to dusts, odors, fumes, toxins, and pulmonary irritants; and can perform simple

_____

[5]As will be discussed, it is unclear whether the ALJ considered Plaintiff's physical impairments in considering the Listings applicable to mental health impairments.

4

repetitive tasks with occasional changes in the work setting and occasional contact with the public and coworkers. Id. at 17. At the fourth step of the evaluation, the ALJ found that Plaintiff could not return to her past relevant work. Id. at 26. However, at the fifth step, based on the testimony of a vocational expert ("VE"), the ALJ concluded that Plaintiff could perform work that exists in significant numbers in the national economy. Id. at 27-28.

Plaintiff claims that the ALJ failed to properly consider the mental health record, the opinions of her treating psychiatrist and therapist, and Plaintiff's testimony, resulting in a deficient RFC determination, which, in turn, corrupted the VE's testimony. Doc. 12 at 6-24. In addition, Plaintiff argues that, in determining whether her impairments met Listing 12.15, the ALJ failed to consider whether her physical and mental impairments in combination met the Listing and substituted her own opinion for that of Plaintiff's treatment providers. Id. at 24-27.

### B. Summary of Medical Evidence

Plaintiff suffered a right hip injury in 2009, when she fell off a third-floor balcony and fractured her hip, for which she underwent ORIF surgery[6] and continues to suffer with chronic pain. Tr. at 336.[7] Plaintiff treated at the Mazzoni Center for both physical

---

[6]ORIF "refers to a surgical procedure used to fix a severe bone fracture, or break. 'Open reduction' means surgery is needed to realign the bone fracture into the normal position. 'Internal fixation' refers to the steel rods, screws, or plates used to keep the bone fracture stable in order to heal the right way and to help prevent infection." See http://www.orthopaedics.com.sg/treatments/screw-fixation (last visited June 21, 2019).

[7]Medical records from the incident indicate that the injury was the result of an assault. Tr. at 236-41, 268.

and mental health impairments during the relevant period, including treatment for

hormone replacement therapy, Human Immunodeficiency Virus ("HIV") care, and

chronic hip pain.  Id. at 301-36.  In March 2014, Plaintiff complained of "serious

concentration issues," and indicated that she had previously been diagnosed with ADHD[8]

and wanted to begin mental health treatment and resume taking Adderall.[9]  Id. at 316.

On July 18, 2014, Plaintiff was hit in the head with a beer bottle and knocked

unconscious for ten to fifteen seconds.  Tr. at 311; see also id. at 40 (Plaintiff's testimony

regarding the assault).  During an office visit to the Mazzoni Center on July 31, 2014,

Maxwell Parrish, CRNP, noted that Plaintiff complained of an ongoing headache, poor

concentration, difficulty sleeping, and concern over emotional effects of the attack.  Id. at

311-14.  According to the treatment notes for September 2014, Plaintiff had a history of

migraines, but had been migraine-free for many years until the July 2014 assault, when

she had an increase in headaches, an aura, nausea, and photophobia.  Id. at 308.  She was

prescribed sumatriptan[10] for treatment of the headaches.  Id.  Reviewing the records from

the Mazzoni Center, it appears that Plaintiff's complaints of and treatment for headaches

---

[8]"The essential feature of [ADHD] is a persistent pattern of inattention and/or
hyperactivity-impulsivity that interferes with functioning or development."  Diagnostic
and Statistical Manual of Mental Disorders, 5th ed. (2013) ("DSM-5") at 61.

[9]Adderall contains a combination of amphetamine and dextroamphetamine, central
nervous system stimulates, used to treat narcolepsy and ADHD.  See
https://www.drugs.com/adderall.html (last visited July 8, 2019).

[10]Sumitriptan is a headache medicine that narrows blood vessels around the brain,
used to treat migraines and cluster headaches.  See
https://www.drugs.com/mtm/sumatriptan-injection.html (last visited July 8, 2019).

alleviated by August 2015.  See id. at 587-90 (treatment note with no complaints of headache and no mention of sumatriptan).[11]  Plaintiff again began complaining of migraines to Mr. Parrish in March 2017, at which time Mr. Parrish prescribed ibuprofen and referred her to neurology.  Id. at 569.[12]  Plaintiff made no migraine complaints in May 2017.  Id. at 564.

During the relevant period, Plaintiff sought treatment for persistent right hip pain. See tr. at 394-409 (records from Regional Orthopedic Associates November 7, 2011 through March 25, 2014), 645-46 (records from Daniel Coachi, M.D., dated May 1, 2017 and June 6, 2017).  Plaintiff had an exacerbation of hip pain in March 2017, for which Mr. Parrish referred her to pain management and orthopedics.  Id. at 569.  A subsequent CT scan showed a tear of the superior labrum.[13]  Id. at 599.  Mr. Parrish's notes indicate that Plaintiff was in pain management for her right hip pain in May 2017, needed to follow up with an orthopedist, and was considering physical therapy.  Id. at 564.  On June

---

[11]The Mazzoni Center records indicate that Plaintiff's sumatriptan prescription was last filled in October 2014, three months after her assault.  Tr. at 591.

[12]On intake at John F. Kennedy Behavioral Health ("JFK") for outpatient mental health treatment in November 2016, Plaintiff reported having migraines twice a week lasting 3 hours each.  Tr. at 661.

[13]"A hip labral tear involves the ring of cartilage (labrum) that follows the outside rim of the socket of your hip joint.  In addition to cushioning the hip joint, the labrum acts like a rubber seal or gasket to help hold the ball at the top of your thighbone securely within your hip socket."  See https://www.mayoclinic.org/diseases-conditions/hip-labral-tear/symptoms-causes/syc-20354873 (last visited June 28, 2019).

9, 2017, Farrah Altuve, PA-C, of Penn Orthopedics, injected Plaintiff's right hip with lidocaine and Depomedrol.[14]  Id. at 722-24.

Ziba Monfared, M.D., conducted a consultative examination for the Administration on March 26, 2015, which included an assessment of Plaintiff's range of motion, ability to do work-related activities, and examination report.  Tr. at 382-93.  The doctor diagnosed physical conditions including right hip pain, ambulatory dysfunction, chronic migraines, asthma, history of AIDS, HIV+, constipation, and insomnia, and found that Plaintiff had normal range of motion except that her right hip forward flexion was 60 degrees out of 100 degrees.  Id. at 383, 393.  He opined that Plaintiff could never lift and carry up to ten pounds, and was only able to sit for fifteen minutes and stand for five minutes in a workday, and could not walk for any period.  Id. at 385.  Dr. Monfared found Plaintiff required a cane to ambulate, and could never use her right foot to operate foot controls.  Id. at 385, 386.

Plaintiff also treated for mental health issues at the Mazzoni Center from approximately February 2015 through June 2016, where she saw Scott Stevens, M.D., and therapist Jasper Liem, LCSW, who diagnosed her with moderate recurrent major

---

[14]"Methylprednisolone [brand name Depo-Medrol] injection provides relief for inflamed areas of the body.  It is used to treat a number of different conditions, such as inflammation (swelling) . . . .  [It] is a corticosteroid (cortisone-like medicine or steroid)[, which] works on the immune system to help relieve swelling, redness, itching, and allergic reactions."  See https://www.mayoclinic.org/drugs-supplements/methylprednisolone-injection-route/description/drg-20075216 (last visited July 8, 2019).

depression, chronic PTSD[15] and intermittent explosive disorder ("IED").[16]  Tr. at 411-

554.  Throughout her treatment with Dr. Stevens, the doctor noted normal or

unremarkable mental status exams ("MSEs").  Id. at 416-17 (9/30/15), 434 (8/5/15), 444

(6/24/15), 463 (4/29/15), 475 (3/17/15), 499 (4/26/16), 507 (4/12/16).  This is consistent

with therapist Liem's notes for the same period which indicated that Plaintiff had

progressed and "appear[ed] very stable and [was] utilizing coping skills and support

network effectively and appropriately" and indicated "she could be ready for discharge in

the next 2 months" in February 2016.  Id. at 527.  Two months later, Mr. Liem noted that

Plaintiff's behavior was active and agitated and her affect was anxious, sad, and tearful.

Id. at 515.  Plaintiff was discharged from therapy on June 12, 2016, when Plaintiff

reached the end of her two-year treatment term and her therapist left practice.  Id. at 488.

Therapist Liem completed a Mental Impairment Questionnaire a year later, on June 16,

2017, indicating that Plaintiff had moderate limitations in her ability to understand,

remember, or apply information, extreme limitations in her abilities to interact with

---

[15]"The essential feature of [PTSD] is the development of characteristic symptoms
following exposure to one or more traumatic events."  DSM-5 at 274.  The clinical
presentation can be predominated by fear-based re-experiencing, emotional, and
behavioral symptoms, anhedonic or dysphoric mood states and negative cognitions;
arousal and reactive-externalizing symptoms; and/or dissociative symptoms.  Id.  The
record contains references to Plaintiff's history of physical, emotional, and sexual abuse.
See, e.g., tr. at 654.

[16]"The impulsive (or anger-based) aggressive outbursts in [IED] have a rapid onset
and, typically, little or no prodromal period.  Outbursts typically last for less than 30
minutes and commonly occur in response to a minor provocation by a close intimate or
associate."  DSM-5 at 466-67.

others and adapt or manage herself, and marked limitation in her ability to concentrate, persist, or maintain pace.  Id. at 651.[17]

In November 2016, Plaintiff began mental health treatment at JFK, where she was treated by Buster Smith, M.D., and therapist Lisa Pozzi, and diagnosed with bipolar II disorder[18] and PTSD.  Tr. at 671-720.  Originally, she was prescribed Seroquel and Zoloft.[19]  Id. at 671.  In December 2016, Dr. Smith increased Plaintiff's dosage of Seroquel.  Id. at 676.  In January 2017, Dr. Smith added Prozac[20] for depression.  Id. at 681.  In February, Dr. Smith increased Prozac and added prazosin[21] for Plaintiff's nightmares.  Id. at 686.  In March, Dr. Smith again increased Plaintiff's dosage of

---

[17]The form Mr. Liem completed used a five-point scale to measure limitation in the patient's ability to function "independently, appropriately, effectively, and on a sustained basis."  Tr. at 651.  "No" or "none" meant no limitation.  Id.  "Mild" meant the patient's functioning in this area is "slightly limited."  Id.  "Moderate" meant the patient's functioning in this area is "fair."  Id.  "Marked" meant the patient's functioning in this area is "seriously limited."  Id.  "Extreme" meant the patient is "not able to function" in this area.  Id.

[18]"Bipolar II disorder is characterized by a clinical course of recurring mood episodes consisting of one or more major depressive episodes . . . and at least one hypomanic episode."  DSM-5 at 135.

[19]Seroquel is an antipsychotic used to treat schizophrenia, bipolar disorder, and used together with an antidepressant to treat major depressive disorder.  See https://www.drugs.com/seroquel.html (last visited July 8, 2019).  Zoloft is an antidepressant.  See https://www.drugs.com/zoloft.html (last visited July 8, 2019).

[20]Prozac is an antidepressant.  See https://www.drugs.com/prozac.html (last visited July 8, 2019).

[21]Prazosin is used to treat hypertension.  See https://www.drugs.com/mtm/prazosin.html (last visited July 8, 2019).

Seroquel.  Id. at 691.  On many occasions throughout this period, Dr. Smith found

Plaintiff's concentration/attention to be distractable or variable.  Id. at 672 (12/1/16 –

distractable), 678 (12/15/16 – distractable), 688 (Jan. 24, 2017 – variable), 693 (March

23, 2017 – distractable).  In a treatment summary on May 23, 2017, Ms. Pozzi explained

that Plaintiff "presents as anxious and stressed" and noted that her concentration "is

variable and is affected by mood lability and migraines."  Id. at 654.  Dr. Smith

completed a Medical Source Statement of Ability to Do Work-Related Activities

(Mental) on May 24, 2017, in which he found that Plaintiff has moderate limitations in

her ability to understand and remember simple instructions, marked limitation in her

ability to carry out simple instructions, and extreme limitation in her ability to make

judgments on simple work-related decisions, understand, remember, and carry out

complex instructions, and make judgments on complex work-related decisions.[22]  Id. at

639.  The doctor also found Plaintiff had extreme limitations in interacting with the

public, co-workers, or supervisors, and in responding appropriately to usual work

situations and changes in a routine work setting.  Id. at 640.

---

[22]The form completed by Dr. Smith also used a five-point scale, but the definitions
differed slightly from the form completed by Mr. Liem.  "None" meant "[a]bsent or
minimal limitations.  If limitations are present they are transient and/or expected
reactions to psychological stresses."  Tr. at 639.  "Mild" meant "[t]here is a slight
limitation in this area, but the individual can generally function well."  Id.  "Moderate"
meant "[t]here is more than a slight limitation in this area but the individual is still able to
function satisfactorily."  Id.  "Marked" meant "[t]here is serious limitation in this area.
There is substantial loss in the ability to effectively function."  Id.  "Extreme" meant
"[t]here is a major limitation in this area.  There is no useful ability to function in this
area."  Id.

On March 12, 2015, Sandra Banks, Ph.D., reviewed Plaintiff's record at the initial consideration stage and found that Plaintiff suffered from affective, anxiety, and organic mental disorders, which caused mild limitations in activities of daily living and social functioning, and moderate limitations in concentration, persistence or pace. Tr. at 89.

### C.   Other Evidence

Plaintiff was born on March 11, 2986. Tr. at 160. She completed high school and has past work experience as a fast food manager, retail manager, waitress, website designer, a home health aide/companion, security guard, and a tax preparer. Id. at 49-51, 52, 188. She testified at the hearing that she is disabled as a result of severe depression and anxiety due to PTSD. Id. at 38. She has nightmares that sometimes cause her to wake up and wet the bed, and she may be up for hours crying. Id. at 38-39. She gets overwhelmed when she feels that someone is in her personal space or that she might be attacked, and can become violent and angry in such situations. Id. at 30. She described these patterns beginning when she was in foster care from ages 12 to 16 during which she was repeatedly molested and raped, and also described being arrested for defending herself from an attack and being raped in prison. Id.

Plaintiff lives at the family home of her boyfriend, although her boyfriend is rarely home as he is in the military, and her boyfriend's parents often stay at the home as well. Tr. at 40, 43. On a typical day, if she was able to sleep the night before, Plaintiff will get up early to take her medication and then go back to bed for an hour or two and then get up to eat. Id. at 41. She often attends appointments, and sometimes plays cards and takes walks with her boyfriend's mother. Id. The mother handles almost all of the household

chores, and Plaintiff testified that it is hard for her to stand to do the dishes.  Id. at 42.

She volunteers once every other week co-leading a support group for PTSD and anxiety.

Id. at 44.  She has had debilitating migraines since age 18, and due to problems with

insurance coverage is on a waiting list to see a neurologist.  Id. at 46.  She is isolated in

her daily activities, and will "crash and burn" if she tries to do too much.  Id. at 48.

      **D.**      **Consideration of Plaintiff's Claims**

          1.      <u>Consideration of Mental Health Records/Opinions</u>

Plaintiff's claims focus primarily on the ALJ's consideration of evidence relating

to her mental health treatment and the limitations imposed by her mental health

impairments.  Generally, Plaintiff complains that the ALJ failed to provide any

"meaningful evaluation or discussion of the content of a majority of the detailed [mental

health] treatment records."  Doc. 12 at 6-11.  More specifically, Plaintiff complains that

the ALJ failed to properly evaluate Plaintiff's testimony regarding her mental health

related symptoms, id. at 11-12, and failed to give proper weight to the opinions of her

psychiatrist, Dr. Smith, and therapist, Mr. Liem.  Id. at 15-23.

Generally, the governing regulations dictate that an ALJ must give medical

opinions the weight she deems appropriate based on factors such as whether the

physician examined or treated the claimant, whether the opinion is supported by medical

signs and laboratory findings, and whether the opinion is consistent with the record as a

whole.  20 C.F.R. § 416.927(c).[23]  With respect to Plaintiff's argument that Dr. Smith's

opinion is entitled to controlling weight, Doc. 12 at 15-16, the regulations provide that a

treating physician's opinion is entitled to controlling weight if it "is well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent

with the other substantial evidence" in the record.  20 C.F.R. § 416.927(c)(2).

Here, the record contains inconsistencies concerning the effects caused by

Plaintiff's mental health impairments.  For example, Dr. Smith found that Plaintiff had

extreme limitations in any interactions with people in the workplace and marked and

extreme limitations in carrying out simple instructions, making judgments on simple

work-related decisions, and dealing with complex instructions/decisions.  Tr. at 639.

Such serious limitations are inconsistent with other evidence in the record including the

mental status exams conducted by Dr. Stevens, Plaintiff's treating psychiatrist at the

Mazzoni Center, who consistently found Plaintiff to have normal MSEs, id. at 416-17

(9/30/15), 434 (8/5/15), 444 (6/24/15), 463 (4/29/15), 475 (3/17/15), 499 (4/26/16), 507

(4/12/16), and therapist Liem's notes that Plaintiff was mentally stable.  Id. at 522, 527.

With contradictory evidence in the record, Dr. Smith's opinion was not entitled to

controlling weight.

Plaintiff argues in the alternative that the ALJ erred by giving Dr. Smith's

assessment little weight.  Doc. 12 at 19-21.  Defendant responds that the ALJ's

---

[23]Although the regulations governing the consideration of medical evidence have
be amended, the standards I rely on for this discussion are those used for consideration of
claims filed prior to March 27, 2017.

consideration of Dr. Smith's opinion is supported by substantial evidence.  Doc. 13 at 12-14.

"The ALJ must consider all the evidence and give some reason for discounting the evidence she rejects."  Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (citing Stewart v. Sec'y HEW, 714 F.2d 287, 290 (3d Cir. 1983)).  "When a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'"  Id. (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993)).  Here, the ALJ explained her reasons for the limited weight she gave Dr. Smith's opinion.

> Dr. Smith's assessment is given little weight because treatment notes are not consistent with and do not support the limitations imposed by Dr. Smith ([tr. at 656-720]).  [Plaintiff] was consistently noted to have a generally normal mental status examination and Dr. Smith did not suggest further aggressive treatment commiserate [sic] with the suggested limitations.

Tr. at 25.

The problem with the ALJ's assessment is that the MSEs in Dr. Smith's treatment notes -- unlike the prior notes from the Mazzoni Center -- indicate certain abnormalities, including recurrent difficulties with Plaintiff's concentration.  See tr. at 671-72 (12/1/16 - depressed, anxious, irritable mood; auditory hallucinations; distractable concentration; fair judgment), 677-78 (12/15/16 - variable mood; distractable concentration); 682-83 (1/24/17 - anxious, depressed mood), 687-88 (2/23/17 - anxious, depressed mood; variable concentration), 692-93 (3/23/17 - verbose speech; distractable concentration).  During this same period, Dr. Smith made several changes to Plaintiff's medication

regimen to address her mental health issues.  See id. at 676 (12/1/15 - Plaintiff began on

Seroquel; 12/15/15 - increased dosage of Seroquel), 681 (1/24/17 - added Prozac for

depression), 686 (2/23/17 - increased dosage of Prozac and added prazosin for

nightmares), 691 (3/23/17 - increase dosage of Seroquel).  Thus, contrary to the ALJ's

reasoning, Dr. Smith's notes evidence more significant symptoms he was attempting to

address with changes to Plaintiff's medication regimen.

Moreover, the ALJ's reliance on Dr. Banks' assessment is questionable

considering the records that were not available to Dr. Banks at the time of the initial

determination.  In her decision, the ALJ indicated that she gave Dr. Banks' assessment

"great weight because it is consistent with the record as a whole."  Tr. at 26.  Dr. Banks

opined as to Plaintiff's mental health impairments based on a review of records on March

12, 2015.  Id. at 89.  While it is true that "Social Security regulations impose no limit on

how much time may pass between a report and the ALJ's reliance on it," Chandler v.

Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011), the timing is important here

because Dr. Banks did not have the benefit of treatment records from JFK, including a

diagnosis of bipolar disorder, Dr. Smith's MSEs discussed above and his Medical Source

Statement, the notes and treatment summary of therapist Pozzi, and the assessment

completed by long-time therapist Liem.  The ALJ acknowledged that records received at

the hearing level demonstrated that Plaintiff "is more limited in interacting and relating to

others than determined by Dr. Banks," id. at 26, but did not state what she relied on in

reaching that conclusion.  As previously discussed, Dr. Smith's records and Medical

Source Statement, Dr. Liem's assessment, and Ms. Pozzi's letter indicate limitations

16

beyond interacting with others.  Thus, I conclude that the ALJ's consideration of Dr. Smith's assessment is flawed.  On remand, the ALJ should reconsider Dr. Smith's assessment in light of the entire treatment record, including Dr. Smith's treatment notes and MSEs.

Plaintiff also argues that the ALJ's consideration of therapist Liem's opinion was not supported by substantial evidence.  In her decision, the ALJ gave Mr. Liem's assessment little weight because it was not consistent with his notes that he did not believe Plaintiff would be eligible for disability based on her mental impairments and that he discontinued Plaintiff's therapy due to her improvement.  Tr. at 26; see id. at 522 (2/10/16), 527 (2/3/16).  Plaintiff points out that later notes by Mr. Liem indicate that Plaintiff's mental stability was short-lived because less than two months later, Mr. Liem was considering increasing the frequency and length of Plaintiff's therapy sessions.  Doc. 12 at 22 (citing tr. at 513 (4/16/16)).

Rather than evaluating Mr. Liem's treatment notes which include references to Plaintiff's progress at times and worsening symptoms at others, the ALJ focused on specific treatment notes indicating progress and stability.  Although the Third Circuit "do[es] not expect the ALJ to make reference to every relevant treatment note in a case [involving] voluminous medical records, [the court] do[es] expect the ALJ, as the factfinder, to consider and evaluate the medical evidence in the record consistent with his responsibilities under the regulations and case law."  Fargnoli v. Massanari, 247 F.3d 24, 42 (3d Cir. 2001).  An ALJ is not permitted to "cherry-pick[ ] or ignor[e] medical assessments that run counter to her finding."  Rios v. Comm'r of Soc. Sec., 444 F. App'x

532, 535 (3d Cir. 2011) (citing <u>Dougherty v. Barnhart</u>, Civ. No. 05-5383, 2006 WL 2433792, at *10 n.4 (E.D. Pa. Aug. 21, 2006), <u>Colon v. Barnhart</u>, 424 F. Supp.2d 805, 813-14 (E.D. Pa. 2006)); <u>see</u> <u>also</u> <u>Schroeder v. Berryhill</u>, Civ. No. 16-464, 2017 WL 4250057, at *17 (M.D. Pa. Sept. 5, 2017) ("The sort of evaluation, where the evaluator mentions only isolated facts that militate against the finding of disability and ignores much other evidence that points another way, amounts to a 'cherry-picking' of the record which this Court will not abide.").

On remand, the ALJ should reconsider Mr. Liem's assessment in light of his treatment notes, including his later treatment notes indicating a worsening of symptoms, and the entire mental health treatment record, including the notes from JFK.[24]

Having determined that the ALJ must reconsider the opinions offered by Plaintiff's mental health treatment providers, I have no need to address Plaintiff's more general claim that the ALJ erred in evaluating the mental health treatment records. Reconsideration of the opinion evidence offered by Dr. Smith an Mr. Liem will necessarily require an evaluation of the record as a whole and specifically the mental health treatment records.

---

[24]Plaintiff suggests that the ALJ's reference to Mr. Liem's "insistence that [Plaintiff's] treatment end in 2016 due to her improvement," refers to a treatment note from May 13, 2016, in which Mr. Liem reported that he discussed ending treatment with Plaintiff "in the next few months." Doc. 12 at 22-23 (citing <u>tr.</u> at 494). However, it appears that Mr. Liem had broached the subject of ending therapy on several occasions. <u>See</u> <u>tr.</u> at 527 (2/3/16), 522 (2/10/16).

## 2. Consideration of Plaintiff's Testimony

The ALJ found that Plaintiff's testimony concerning the intensity, persistence and limiting effects of her symptoms were "not entirely consistent with the medical evidence and other evidence in the record. <u>Tr.</u> at 18. Plaintiff complains that the ALJ erred in her consideration of Plaintiff's testimony concerning the intensity, persistence, and limiting effects of her symptoms. Doc. 12 at 11-12. Defendant maintains that substantial evidence supports the ALJ's evaluation of Plaintiff's subjective complaints. Doc. 13 at 7-11.

The parties debate the validity of the ALJ's statement (<u>tr.</u> at 24) that Plaintiff "has not consistently sought [mental health] treatment." Doc. 12 at 12; Doc. 13 at 10. Plaintiff argues that the ALJ's decision is internally inconsistent in this regard because the ALJ had earlier noted that Plaintiff consistently participated in therapy at the Mazzoni Center from October 2014 through June 2016. Doc. 12 at 12 (citing <u>tr.</u> at 21). However, the record indicates that Dr. Stevens noted that Plaintiff had not seen him for medication management for six months <u>tr.</u> at 507, and there was a lapse in treatment from June 2016, when she was discharged from Mr. Liem's therapy sessions, and November 2016, when she began treatment at JFK.

In any event, reconsideration of the mental health treatment evidence and the opinion evidence offered by Dr. Smith and Mr. Liem will likely affect the consideration of Plaintiff's testimony concerning the intensity, persistence, and limiting effects of her symptoms. Therefore, on remand, the ALJ shall also reconsider Plaintiff's testimony in

light of the reconsideration of the record as a whole and the mental health treatment record and opinions specifically.

### 3. Listing 12.15

Plaintiff challenges the ALJ's step-three analysis, specifically the ALJ's consideration of Listing 12.15. Doc. 12 at 24-27. Defendant maintains that the ALJ's step-three analysis is supported by substantial evidence. Doc. 13 at 20-25.

Listing 12.15, applicable to trauma- and stressor-related disorders, requires the claimant to establish that she meets the criteria of subsections A and B or A and C. 20 C.F.R. Pt. 404, Subpt. P. App.1 § 12.15 (2017).[25] Here, the ALJ did not address subsection A, but found that Plaintiff did not meet subsection B or C. With respect to subsection B, the ALJ found Plaintiff had mild limitations in understanding, remembering, or applying information and in the ability to adapt or manage herself, and moderate limitations in the ability to interact with others and the ability to concentrate, persist, or maintain pace. Tr. at 16.

---

[25]Subsection A requires medical documentation of: (1) exposure to actual or threatened death, serious injury, or violence; (2) subsequent involuntary re-experiencing of the traumatic event including in dreams of flashbacks; (3) avoidance of external reminders of the event; (4) disturbance in mood and behavior; and (5) increases in arousal and reactivity including exaggerated startle response or sleep disturbance. Subsection B requires extreme limitation of one, or marked limitations of two, of the areas of mental functioning: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. Subsection C requires the mental disorder to be "serious and persistent," as further defined in the Listing. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.15.

Plaintiff takes issue with the ALJ's determination of the B criteria of the Listing, alleging that the ALJ did not consider the combination of Plaintiff's physical and mental impairments. Doc. 12 at 24-25. The ALJ stated that "[t]he severity of [Plaintiff's] <u>mental impairments</u>, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04, 12.06, and 12.15." <u>Tr.</u> at 16 (emphasis added). Although the ALJ may have mistakenly indicated that she only considered mental impairments, there is no indication that the ALJ considered Plaintiff's migraines or hip pain in the analysis of the mental health Listings.[26] Thus, the ALJ should reconsider the Listing analysis, specifically addressing the combination of all of Plaintiff's impairments, mental and physical.

In addition to arguing that the ALJ's determination of subsection B of the Listing is supported by substantial evidence, Defendant also argues that Plaintiff has not demonstrated that she has met subsection A of Listing 12.15. Doc. 13 at 24. Because the ALJ's determination did not involve subsection A of the Listing, I have no basis to undertake such an analysis. If the ALJ determines on remand that Plaintiff satisfies the B criteria, the ALJ will address the A criteria in due course.

---

[26]The ALJ concluded her discussion of the B criteria of the mental health Listings by noting, "[b]ecause [Plaintiff's] <u>mental impairments</u> do not cause at least two 'marked' limitations or one 'extreme' limitation, the 'paragraph B' criteria are not satisfied," <u>tr.</u> at 17 (emphasis added), again indicating that she considered only the mental health impairments in considering the mental health Listings.

4.    RFC and VE Testimony

Finally, Plaintiff complains that the ALJ's RFC assessment failed to include all of Plaintiff's "well-supported subjective symptoms," resulting in a flawed hypothetical posed to the VE. Doc. 12 at 12-15. In order for vocational testimony to provide substantial evidence for the ALJ's determination that there are substantial jobs in the economy which the claimant could perform, the hypothetical posed to the VE must accurately portray the claimant's impairments that are supported by the record. Money v. Barnhart, 91 F. App'x 210, 213 (3d Cir. 2004) (citing Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987); Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984)).

Here, I have already determined that the ALJ must reconsider the mental health opinion evidence in light of the record as a whole and specifically the entirety of the mental health treatment evidence. Because such reconsideration may affect the ALJ's RFC determination, requiring additional vocational testimony, I have no need to address this claim further.

## IV.    **CONCLUSION**

The ALJ's consideration of the opinion evidence offered by Plaintiff's treating mental health providers is flawed, requiring remand of the case. Plaintiff's testimony should be reconsidered in light of an evaluation of the entire record, including the more recent mental health treatment records and reports. Reconsideration of this evidence may affect the ALJ's RFC assessment, requiring additional vocational evidence.

An appropriate Order follows.